We'll move then to the second argument of the day in case number 2014-70, Cunningham v. Noel, and we'll begin with Ms. Landewich. Landewich, Your Honor. I'm sorry. Ms. Landewich, you may proceed when you're ready. Thank you, and may it please the Court. My name is Laura Landewich, and I represent the plaintiff, Appellant Bruce Cunningham, in this 1983 case regarding a failure to provide medical care to a pretrial detainee. The appellant is asking the Court to reverse summary judgment and remand the case for trial.  At its most fundamental, the District Court erred by failing to construe the facts in plaintiff's favor. The Court went so far as to ignore the fact that Bruce Cunningham suffered an alcohol withdrawal seizure after 17 hours of unmonitored and untreated detox in the Clark County Jail's drunk tank. It accomplished this by disregarding all of the medical proof and excluding the expert's testimony that was tendered by the plaintiff. Let me stop you there, please. Why did you propose or agree to the case management plan, knowing that expert depositions would not be completed until after the summary judgment deadlines had passed? Did you object? No, Your Honor. The initial case management plan was based on the Court's suggested deadlines that are set forth in its local rules. The issue in this case came with multiple problems with discovery. As the Court may be aware, there were multiple motions to compel. There was an order granting sanctions and several requests to extend the discovery deadline so that the plaintiff could get whatever information was available. As a result of that, at the end of the day, in order not to continue to exacerbate the Court and the Court's desire to keep the case on schedule, we did request further extensions of the discovery deadline despite the dispositive motions and the fact that experts had not been fully vetted. Ms. Landewich, those depositions that were going to take place or that did take place after the summary judgment deadline, those were defense depositions, right? Two depositions were of the plaintiff's experts and one deposition was of the defendant's expert. And that creates one of plaintiff's issues on appeal, which is— So my question with that is that was it your view that in the depositions that defense counsel was going to take of Mr. Cunningham's experts, that are you planned to affirmatively use some of the testimony that you may have expected from those depositions to oppose the summary judgment motion? No, Your Honor. It's our position that the expert reports that were tendered with the summary judgment motion were sufficient evidence to support the plaintiff's position on summary judgment. And it's our position further that the 2010 amendments to the civil rules, particularly Rule 56C, allows for a broad scope of evidence to be considered by a court at summary judgment. And there is no requirement that every piece of evidence is presented in a format that is necessarily admissible in court as long as the content would be admissible. And there has been no adjudication on whether Rule 702 prohibits any of the expert testimony that was tendered. In fact, the court didn't even consider it based on the fact that the expert reports were unsworn. But turning to the defendant's expert witness, who was also deposed after summary judgment briefing, there is no prejudice whatsoever to the defendant if that testimony is allowed to come in. Dr. Frick was the defense expert. He was proffered to show that Bruce Cunningham did not suffer from alcohol withdrawal and did not suffer a serious medical condition. And in fact, upon taking his deposition, Dr. Frick conceded that, yes, indeed, Bruce Cunningham suffered an alcohol withdrawal seizure. He did likely suffer other symptoms while he was incarcerated, although we don't know that because the jail did not preserve any of its evidence while he was incarcerated. And that had Bruce Cunningham been sent to a facility as the procedures at the jail required, he would have been admitted because an alcohol level of 0.355 is dangerously high based on anyone's scale. This evidence was promptly tendered after the depositions and a full year before the judge ruled on summary judgment. So regardless of whether the plaintiff's expert depositions ought to be considered, it was an abuse of discretion for the judge not to consider the evidence that Dr. Frick provided upon his deposition. You know, you argue in your brief that the officers, Elliot, Ruby, Nutter and Rice had notice of Cunningham's medical need because they were aware that he was extraordinarily intoxicated. But how do we get from notice of extreme but not necessarily dangerous intoxication to notice of a risk of a seizure, particularly when Cunningham himself seemed to give no signs that he was in any medical distress? Well, Your Honor, we dispute the allegation that he was in no medical distress because what happened was he was thrown in a cell and never seen. There was no documentation that he was ever checked on ever again. And the medical proof says that an alcohol withdrawal seizure. I don't I don't know that that's fair that he was thrown in a cell. OK, didn't I thought that officers Nutter testified that he had him on a what he called a short watch or a mini watch or something. And he was having conversations with Mr. Cunningham. Mr. Cunningham was drinking water. He was given food. Now, if what you're talking about is later, he was booked. But pre booking, isn't that what Officer Nutter testified to? Officer Nutter testified he called it a little watch, but it's not a watch. He said that he kept him on a bench in the booking area and testified that he gave him some water and testified that he could communicate. So what are you counting to when when you say he was thrown into a cell? Because when when Officer Nutter left that night at 930, which was about two hours after Cunningham entered the facility, he put him in the drunk tank. And there is no record of any effort to check on anyone in the drunk tank. Officer Nutter testified himself that the only checks he does on people in the drunk tank is to see whether they're alive. And in a jail that has 500 beds and is regularly intaking people who are at risk of detox to have no no effort whatsoever to monitor the people that are in those cells is is the equivalent of ignoring all medical care whatsoever. The defendants, even though this particular policy wasn't produced in discovery in this case, it was produced in a different case and and later tendered to the court. The policy at the jail says that a blood alcohol level in excess of 0.25 is a serious impairment and it requires a medical evaluation to see if the person requires observation. Because the way detox works is that as you sober up, the risk of complications increases. And that is exactly what happened here. Bruce Cunningham did not just suddenly have a seizure. He was in a tank. There's no video of what happened in the tank. All of the records regarding who was in the tank with him that might have been able to testify about whether he was vomiting, shaking, sweating, having any of the other pre seizure symptoms. None of that was preserved. The identities of the officers that were on shift that night after Lieutenant Nutter left were not preserved. The district court used that spoliation to give the defense and inference that Bruce Cunningham did not exhibit any signs of withdrawal. And that is not the summary judgment standard. And frankly, if that were to be to be a permissible inference that incentivizes institutions like jails and prisons to destroy evidence and ignore the people that are in their care so that they can avoid liability when something goes wrong. Where is that in the district court's opinion? What you just referred to? What what page of the district court's opinion is that on? I'm sorry. What are you referring to? The, you know, kind of holding the your point, I think, as I understand it, is you're saying the district court effectively held the spoliation of evidence against Mr. Cunningham. And that's not proper that way. And I didn't. As I'm sitting here right now, I just don't recall where that's at in the district court opinion. I was just trying to put my finger on it. Well, the district court held that Bruce Cunningham did not exhibit any signs of alcohol withdrawal, and the only way that the court can make that inference is to disregard the medical proof and also give the defendant's failure to preserve evidence a credible inference, rather than giving the plaintiff the inference that during that time he was not assessed or monitored in any fashion, which is what the plaintiff argues. And this court has a long history of holding that a failure to give any medical care whatsoever is indeed a Fourth Amendment violation when it comes to pretrial detainees. And that is exactly what happened here. And that failure to monitor, the failure to get any sort of medical assessment whatsoever to someone that is classified within the system as having a serious condition that requires monitoring is a Fourth Amendment violation and is enough to take this case to trial. I'd like to reserve the rest of my time for rebuttal. No problem. That's fine. Let's go. Mr. Stephenson. Yes, Your Honor. Thank you. May it please the court. James Stephenson for the appellees. First, let me respond to the allegation about spoliation. There was no spoliation here whatsoever. In fact, the plaintiff secured material from the jail via public records request even before suit was filed, which is how he knew to sue some 20 plus officers, all of whom were on various shifts. So I see no merit to that. Documentation was provided throughout the litigation. I'll concede the video was not preserved, but the public records request for preservation of video did not occur until about two months before suit was filed, more than a year after the event. And by then it had been rewritten that they don't preserve video beyond a year. So that's what occurred. I would have been preferable to have the video, but it's simply it was not preserved pre-suit. So there clearly was no spoliation. Mr. Stephenson, hello. Lieutenant Nutter explained that he disregarded the policy mandating that arrestees with a blood alcohol content above 0.25% be examined by medical personnel because he was the only booking officer. That evening. But why would that have precluded him from having Mr. Cunningham transported to the hospital for evaluation? I think his testimony was there was a situation, as he put it, at the jail, which didn't allow other officers in the jail to be available then and there. So he interacted with Cunningham and discovered that he was communicative and he even remarked that he knew Lieutenant Nutter's uncle because he was a former firefighter. So he took it upon himself to to conduct his own sort of informal watch. And he did say that he had some concerns about Cunningham. But I think taking his testimony as a whole, it appears he he assessed him during those couple hours. He was there a couple hours outside the drunk tank, determined he was sobering up. He had been drinking. He had been eating. And hence, he chose not to refer him to the hospital. But yes, he he certainly could have done so. He would have had to call in a road deputy to do that. And that that could have been undertaken. Where are the records of inmates who were held in the jail on the same night? Pursuant to jail policy, are those records ordinarily kept or destroyed? They're maintained and documentation was provided, at least that I've seen, that shows certain inmates in the drunk tank. I will admit that knowing jails as I do, inmates move around. They get moved from the drunk tank to the general population or they bond out. And there may not be a full record of any and everyone who was in the drunk tank, but there's certainly some documentation, because I've seen it, of certain arrestees who were in the drunk tank. Now, did that prevent the plaintiff from interviewing these people? No, they certainly could have done so. So that's that's the answer I can supply you, Your Honor. Thank you, Your Honors. In my view, the primary issue is whether the record reflects evidence beyond intoxication, which showed Cunningham had a serious medical need, which required referral to an emergency room as opposed to simply keeping an eye on him before putting him in the drunk tank. He admitted he had no history of seizures. As I point out, he was able to carry on conversation both at the scene and at the jail. He wasn't falling over. He wasn't swaying. His blood alcohol content per the breathalyzer was .311, which is still high. I grant you that. Mr. Stephenson, do we know when that breathalyzer was given in relation to when he was admitted to the jail? It was given shortly after he was transported from the scene to the jail, to the booking area. I think it has a timestamp, Your Honor. It's in the record, the breathalyzer result. I don't remember it offhand, but my recollection is it was pretty soon after he was brought into the jail by the arresting officer. The 311? Yes. The 311 BAC. In your brief, you say it was at 6.38 p.m. Thank you, Your Honor. Would that have been about an hour before he was admitted to the jail, though? No, it would have been shortly after. He was not booked in formally until like 1 in the morning, but he was in the jail. I think the arrest was around 6 p.m., transport to the jail, breathalyzer, turn him over to Nutter. Nutter deals with him until 9.45. He goes off shift, puts him in the drunk tank. The booking? Yeah, sorry. I'm sorry. Oh, God. See, we have the existence of multiple jail policies that identify a blood alcohol content above 0.25% as a medical condition that requires professional examination. Shouldn't that be enough to alert defendants that a blood alcohol content of the much higher number that we have here is outside the range of ordinary non-life-threatening drunkenness? Let me answer that this way, Your Honor. To begin with the policy, the 0.25 is primarily there to instruct officers that intoxication at that level or above suggests the arrestee is seriously impaired. So they don't want, as a matter of policy, to take in arrestees who are highly intoxicated in general unless there's been some clearance, so to speak, by the emergency room. On the other hand, constitutional liability cannot be predicated upon violation of this local regulation. And in fact, I've cited cases that admittedly one is from the Sixth Circuit, but even from our circuit, the Lovett case speaks in terms of high extreme intoxication standing alone is not enough to violate the Fourth Amendment. Now, if there's more, if he can't walk, if he can't speak, if there's facts of that nature, then we're at least looking at an issue of fact. But here we don't have that. So unless the court is going to create some policy or some bright line rule that says any arrestee over 0.25 has his Fourth Amendment right violated unless he gets medical clearance, that's certainly not in keeping with prior decision. Mr. Stephenson, I just want you to, I think I know what you're going to say, but it would help for you to address this. It looked to me from reading the deposition testimony that Sheriff Knoll has really buckled down on the policy a bit, that there's not a whole lot of latitude anymore. And one of the street officers, I don't know if it was Elliott or Gruby, testified that today, in the wake of Sheriff Knoll's strict enforcement of that policy, that the radio car would head straight to the hospital with a BAC at this level. I think that's the way I took the testimony anyway. What, if any, significance is there in that to our analysis? Well, the sheriff, he took office in January of 2015, and this is an occurrence in August of that year. He has been more strict than his predecessor, who, I wouldn't say the predecessor fostered a climate of not adhering to it, but there was a history of discretion, so to speak, on the part of the booking officer as to whether to really adhere to the policy. So it's true the sheriff has been more rigorous in terms of enforcing the policy because it's in the state jail regulations, and he wanted it to be adhered to. Still, from my perspective, and I think from the district courts, we can't simply look at the .25 as somehow defining some constitutional threshold. We certainly can't look at that from a qualified immunity perspective. Look at the cases that I cite, not only from this circuit, but from other circuits, where the one out of the Sixth Circuit, where the guy was .331 or .30, and the Sixth Circuit held, well, absent some other evidence beyond extreme intoxication, we're not going to find a constitutional violation. So I think my clients, and to defend the district court, the district court did not rule on qualified immunity because he didn't get to the issue, but to defend the district court's ruling is certainly supportable by prior decisional law. I don't know if that answers your question adequately or not, Your Honor. Yeah, thank you. What record is there of anyone monitoring or checking in on Cunningham between the time he was placed in the drunk tank and the time he was injured, which was approximately 14 hours later? There's no record. There's simply testimony from Nutter, for example. And by the way, I think that's not a fair characterization of his testimony to say he simply checked on people in the drunk tank to see if they're alive. He and other deputies testified that they go into the drunk tank, recognize that the drunk tank is a holding area. It's not where inmates remain for a long period. They check to see, are they breathing? Are they, you know, to get some verbal response of some nature, and then they walk out. But there is no digital record of checking the drunk tank. Well, what's the difference between checking to see if someone is alive and checking to see if someone's breathing? I think if you're not breathing, you're not alive. Okay. Well, he did use that term, so I'll grant you that, Your Honor. I'm just responding insofar as how things were handled there and elsewhere in jails. That's what they do in drunk tanks. I will point out that most arrestees in drunk tanks bond out. They don't release them until they sober up. That's the way jails are run. But they bond out the next day, or if they can't bond out, they put them in general population. I did want to comment, Your Honors, on a point that I think merits discussion in connection with our existing law. The third factor on the four-part test employed by the district court inquires as to whether there was requested treatment. On the other hand, if you look at Lovett v. Herbert, which was decided two years ago, the third category is characterized as alleged required treatment, which is kind of different. If you look at the cite in Lovett, it's to Williams v. Rodriguez from 2007, which in fact characterizes that factor as requested treatment, which I think is the proper inquiry. And the district court here, while it cited Lovett and used the term required treatment, ruled on the basis of was there a request for treatment? And the answer is no, he didn't. He being Cunningham. He was even asked, by the way, do you want to see the nurse? And there are nurses available in the jail, at least on call 24-7. He declined that. So when the court employs the sliding scale and the Fourth Amendment test, it's a balancing test. If the court applies that in accord with prior decisional law, it's inescapable in my view that the first two criteria, the perceived medical need and the seriousness of it, amount to nothing more than extreme intoxication, insufficient to carry a constitutional claim. And the third factor weighs in our favor as well. Your Honor, as I see my time has elapsed, unless there's other questions, I'm going to conclude. Okay. Seeing none, thank you, Mr. Stevenson. Ms. Landewich, you have not quite three minutes. Thank you, Your Honor. I would just like to point out that the evidence that was produced by the jail, for example, about who was in the drunk tank, the drunk tank showed that it was empty when Bruce Cunningham had his seizure. And the medical records show that there was another detainee in that drunk tank who alerted staff to the fact that he had a seizure. And every single witness testified that the drunk tank was full that night. So the idea that I should have to go and interview all 500 residents of the jail in order to find out who witnessed it is ridiculous. And the jail does keep those records. In fact, when Lieutenant Nutter testified on page 58 of his deposition that he would walk through the drunk tank and, I quote, make sure everybody is alive, he said that there's a list outside the drunk tank that there's a clipboard that has everybody in it. We don't have that. But I want to focus very quickly on the objectively reasonable treatment requirements under the Fourth Amendment. The first requirement is that an officer has notice of a medical need. There is no dispute that every single officer, the two arresting officers and the two officers we know that were working in booking, knew that Bruce Cunningham, pursuant to their policies, had a serious medical need. There is no dispute about that. The second question is whether it's a serious need. Now, not only does the policy itself characterize this level of intoxication as serious, but every single expert that testified in this case said that jails have to have procedures in place for people at risk of withdrawal. This is not about just being drunk. This is about monitoring people who are at risk for death and other serious complications, and these people are in the jails regularly, daily even. And to have no procedure in place and no effort to monitor those people is the equivalent of zero medical care. The third requirement, the scope of required treatment, every expert simply said he had to be monitored for signs of withdrawal. No one, even Nutter's little watch that he had a mom before putting him in the drunk tank, did not include any assessment of whether he was sweating, whether he was vomiting, whether he had tremors. There was no assessment whatsoever. And finally, police interests. Ortiz v. City of Chicago says taking someone to a hospital is not onerous and does not implicate any police interests. The district court clearly erred in this case. Thank you. Okay. Thank you, Ms. Landowich. Mr. Stevenson, thanks to you. The court will take the case under advisement. We're going to take a 10-minute recess before we proceed to our third argument of the morning, and we will change a member of the panel as well. And so we'll see everybody in 10 minutes, and at that point we'll take up Sweeney v. Raul.